# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Clarence Ray ALLEN,<br><br>    Plaintiff,<br><br>    v.<br><br>Roderick HICKMAN, Secretary, California Department of Corrections and Rehabilitation, et al.,<br><br>    Defendants. | Case Number C 05 5051 JSW<br><br>DEATH-PENALTY CASE<br><br>ORDER DENYING PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND DISMISSING PLAINTIFF'S FIRST AMENDED COMPLAINT WITHOUT PREJUDICE<br><br>[Docket Nos. 6 & 17] |

    Plaintiff Clarence Ray Allen, a condemned inmate at California's San Quentin State Prison, is scheduled to be executed on January 17, 2006.  He applies for a temporary restraining order and an order to show cause why a preliminary injunction should not issue to stay his execution for alleged violations of his rights under the Sixth, Eighth and Fourteenth Amendments.  Plaintiff's Application is opposed by Defendants Roderick Hickman, Secretary of the California Department of Corrections and Rehabilitation; S.W. Ornoski, Acting Warden of San Quentin State Prison; and Arnold Schwarzenegger, Governor of California.  The Court has read the moving and responding papers.  The Court has jurisdiction pursuant to 42 U.S.C. § 1983 (2005) and finds that it is appropriate to resolve Plaintiff's Application without oral argument

1  pursuant to Civil Local Rule 7-1(b).  For the reasons set forth below, the Court denies Plaintiff's

2  Application for a Temporary Restraining Order and Order to Show Cause and dismisses

3  Plaintiff's First Amended Complaint without prejudice.

4  I. BACKGROUND

5  Plaintiff was convicted of murder and sentenced to death in 1982.  He is now 75 years

6  old.  Plaintiff suffers from coronary artery disease and diabetes.  In addition, he is legally blind.

7  Over the course of his incarceration, Plaintiff alleges that he has received inadequate

8  medical care.  Prior to 2005, he alleges, this has included having his Vitamin E supplement

9  arbitrarily not renewed in 1993 and his medication for diabetes arbitrarily halved in 1997.  Also

10  prior to 2005, Plaintiff was independently evaluated twice by psychologists:  Dr. Eric S.

11  Morgenthaler issued his report on January 10, 1991, and Dr. Gretchen E. White issued hers on

12  July 25, 1996.

13  On January 24, 2005, the United States Court of Appeals for the Ninth Circuit affirmed

14  the denial of Plaintiff's federal petition for a writ of habeas corpus, denied his petition for

15  rehearing and rejected his suggestion for rehearing en banc.  Plaintiff was aware that, unless the

16  Supreme Court of the United States granted him a writ of certiorari, his execution soon would be

17  scheduled.  Plaintiff's counsel, Michael Satris, Esq., visited Plaintiff on February 7.

18  Dr. Jahangir Sadeghi, an ophthalmologist, examined Plaintiff on June 30 and concluded

19  that Plaintiff suffers from diabetic retinopathy and recommended that Plaintiff undergo laser

20  surgery to correct his vision.  On July 18, Sadeghi submitted a request to schedule the

21  recommended laser surgery; to date, laser surgery has not been scheduled.

22  On September 2, Plaintiff experienced a heart attack (allegedly possibly due to the

23  arbitrary withholding of critical medication from June 15 to August 4).  Plaintiff was taken first

24  to the prison hospital and then to Marin General Hospital, where doctors performed angioplasty

25  and Plaintiff successfully underwent cardiac catheterization.  After Plaintiff regained

26  consciousness around September 9, Dr. Henry L. Zhu recommended to Plaintiff that he undergo

27  coronary artery bypass grafting surgery; however, Plaintiff developed a staphylococcal infection

28  that required treatment with intravenous antibiotics.  On September 18, having been weaned off

2

1   the IV, Plaintiff was transferred to Queen of the Valley Hospital for, among other things,

2   revascularization and consideration of surgery.  Shortly thereafter, Plaintiff underwent another

3   cardiac catheterization to determine whether surgery would be appropriate; Dr. Robert R.

4   Klingman determined that it would be.  However, Plaintiff refused treatment and was returned to

5   San Quentin.[1]

6       At San Quentin, on September 20, Plaintiff's counsel's capital-case consultant, Denise E.

7   Ferry, visited Plaintiff, and a prison physician named Dr. Aydar explained the need for surgery

8   to Plaintiff, who then consented to surgery.  The following day, on September 21, Ferry visited

9   Plaintiff again, and Plaintiff had a session with Dr. Dale G. Watson, a forensic psychologist

10  retained by Plaintiff's counsel to assess Plaintiff's brain functioning to help prepare Plaintiff's

11  clemency petition; Watson abbreviated the session due to Plaintiff's poor health.  Later that day,

12  Plaintiff was transferred to Corcoran State Prison due to the severity of his medical condition.

13  Watson was scheduled to see Plaintiff again on September 22 but was advised at San Quentin's

14  gate that Plaintiff was at Corcoran.  Satris attempted to contact Plaintiff during the week that

15  Plaintiff was at Corcoran, but Plaintiff was never advised of this.

16      On September 28, Plaintiff was returned to Queen of the Valley Hospital for further

17  cardiology evaluation.  Following repeat angiographic imaging, Klingman determined that

18  surgery no longer was indicated and that Plaintiff's condition easily could be treated medically.

19  Plaintiff was returned to San Quentin's hospital on September 30; on October 4, Plaintiff was

20

21      ─────────────

22      [1]Klingman's consultation report at the time of Plaintiff's discharge from Queen of the Valley
    Hospital states:

23          I have discussed with the patient that I think that he should undergo a
            repeat cardiac catheterization to assess his anatomy for consideration of

24          coronary artery bypass grafting.  The patient has told me, however, that
            he is on death row.  He says that his time is just about up and he will be

25          the next one to be executed and, for this reason, he is not interested in
            proceeding with any further interventions.  He states that at this time he

26          does not have pain, and he thinks it would be silly for him to undergo
            bypass surgery prior to being executed.  He says that he would rather

27          have the opportunity to spend time with his family.  I have offered him
            intervention, and at this time he is refusing and he would prefer to go

28          back to San Quentin.

3

1   released from the prison hospital and returned to his cell.

2       Meanwhile, on October 3, the Supreme Court of the United States denied Plaintiff's

3   certiorari petition, thereby drawing Plaintiff's federal habeas proceedings to a close.  Ferry

4   visited Plaintiff on October 6.  On October 11, the Glenn County Superior Court scheduled a

5   public session for November 18 to set Plaintiff's execution date.

6       Dr. Peter Pompei independently examined Plaintiff on October 17.  Pompei

7   recommended that Plaintiff's primary-care physician consider the possibility of administering a

8   stress test to Plaintiff to characterize his risk of myocardial ischemia.  Plaintiff has requested a

9   stress test but has not been given one to date.

10      Ferry visited Plaintiff again on October 20.  Watson had a second session with Plaintiff

11   on October 25.  On October 27, Satris visited Plaintiff.  Watson examined Plaintiff a third and

12   final time on November 1.  Ferry returned to San Quentin to see Plaintiff on November 8 and

13   Plaintiff's counsel's investigator, David Hinckley, visited Plaintiff on November 10.

14      On November 16, the Supreme Court of California expanded its appointment of Satris to

15   include Plaintiff's clemency proceedings, and Ferry visited Plaintiff one more time.  On

16   November 17, Defendant Schwarzenegger directed Plaintiff to file any clemency petition not

17   later than 35 days prior to his scheduled execution date.  Then, on November 18, the Glenn

18   County Superior Court set January 17, 2006, for Plaintiff's execution; the due date for Plaintiff's

19   clemency petition thereby became December 13, 2005.  Also on November 18, Satris requested

20   that San Quentin arrange for Plaintiff to undergo a SPECT test and an MRI scan pursuant to

21   Watson's recommendation as part of Watson's investigation into whether Plaintiff suffers from

22   brain damage; to date, however, Plaintiff has not been permitted to undergo these procedures.

23      On November 22, Ferry visited Plaintiff.  Subsequently, in preparation of Plaintiff's

24   clemency petition, Dr. Paul Good, a psychologist, examined Plaintiff on November 30 and

25   December 5 and Dr. Pablo Stewart, a psychiatrist, examined Plaintiff on December 2 and

26   December 6.

27      Plaintiff filed the present action on December 7.  With the Application currently before

28   the Court, Plaintiff seeks an injunction requiring a postponement of the due date for his

4

1    clemency petition and staying his execution until he has a stress test and, if subsequently

2    recommended, open-heart surgery, and has undergone laser surgery on his eyes, MRI procedures

3    and a SPECT test to assist him in preparing his clemency petition.

4        The Court issued an expedited scheduling order for briefing Plaintiff's Application on

5    December 8.  Pursuant to that order, Defendants filed their Opposition to the Application on

6    December 12 and Plaintiff filed his Reply to Defendants' Opposition on December 13.  Also on

7    December 13, Plaintiff petitioned Defendant Schwarzenegger for clemency:  Plaintiff is asking

8    Defendant Schwarzenegger to commute his sentence to life in prison or, alternatively, to grant

9    him a reprieve, in part to enable him to receive care for his heart disease and to undergo laser

10   surgery and tests to develop further evidence supporting his request for commutation.

11                                    II.  LEGAL STANDARD

12       The United States Court of Appeals for the Ninth Circuit has explained that a condemned

13   inmate seeking a stay of execution is

14                 required to demonstrate (1) a strong likelihood of success on the
                   merits, (2) the possibility of irreparable injury to the plaintiff if
15                 preliminary relief is not granted, (3) a balance of hardships
                   favoring the plaintiff, and (4) advancement of the public interest
16                 (in certain cases).  Alternatively, injunctive relief could be granted
                   if he demonstrated either a combination of probable success on the
17                 merits and the possibility of irreparable injury or that serious
                   questions are raised and the balance of hardships tips sharply in his
18                 favor.  These two alternatives represent extremes of a single
                   continuum, rather than two separate tests.  Thus, the greater the
19                 relative hardship to the party seeking the preliminary injunction,
                   the less probability of success must be established by the party.  In
20                 cases where the public interest is involved, the district court must
                   also examine whether the public interest favors the plaintiff.  [¶]
21                 In capital cases, the Supreme Court has instructed that equity must
                   take into consideration the State's strong interest in proceeding
22                 with its judgment.

23   *Beardslee v. Woodford*, 395 F.3d 1064, 1067-68 (9th Cir. 2005) (internal quotation marks,

24   citations, brackets and emphasis omitted).

25                                    III.  DISCUSSION

26                          A.  Exhaustion of Administrative Remedies

27       It is undisputed that Plaintiff has failed to exhaust the available administrative remedies

28   for his claims.  The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321

                                              5

1   (1996) ("PLRA"), amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with

2   respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner

3   confined in any jail, prison, or other correctional facility until such administrative remedies as

4   are available are exhausted."  42 U.S.C. § 1997e(a).  An action must be dismissed unless the

5   prisoner exhausted his available administrative remedies *before* he or she filed suit, even if the

6   prisoner fully exhausts while the suit is pending.  *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th

7   Cir. 2002).

8          "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life,

9   whether they involve general circumstances or particular episodes, and whether they allege

10  excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Exhaustion

11  of all "available" remedies is mandatory; those remedies need not meet federal standards, nor

12  must they be "plain, speedy and effective." *Porter*, 534 U.S. at 524; *Booth v. Churner*, 532 U.S.

13  731, 739-40 & n.5 (2001).  Even when the prisoner seeks relief not available in grievance

14  proceedings exhaustion is a prerequisite to suit.  *Id.* at 741.[2]  The obligation to exhaust persists as

15  long as *some* remedy is available; when that is no longer the case, the prisoner need not further

16  pursue the grievance.  *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005).

17         The State of California provides its inmates and parolees the right to appeal

18  administratively "any departmental decision, action, condition or policy perceived by those

19  individuals as adversely affecting their welfare."  Cal. Code Regs. tit. 15, § 3084.1(a).  It also

20  provides its inmates the right to file administrative appeals alleging misconduct by correctional

21  officers.  *See id.* § 3084.1(e).  In order to exhaust available administrative remedies within this

22  system, a prisoner must proceed through several levels of appeal:  (1) informal resolution, (2)

23  formal written appeal on a CDC 602 inmate appeal form, (3) second-level appeal to the institution

24  head or designee, and (4) third-level appeal to the Director of the California Department of

25  ────────────────

26         [2]That the administrative procedure cannot result in the particular form of relief requested by the
    prisoner does not excuse exhaustion because some sort of relief or responsive action may result from the
27  grievance.  *See Booth*, 532 U.S. at 737; *see also Porter*, 534 U.S. at 525 (purposes of exhaustion
    requirement include allowing prison to take responsive action, filtering out frivolous cases and creating
28  administrative records).

Case No. C 05 5051 JSW
ORDER DENYING PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO
SHOW CAUSE AND DISMISSING PLAINTIFF'S FIRST AMENDED COMPLAINT WITHOUT PREJUDICE
(DPSAJBDVGGOK)

1   Corrections.  *Id.* § 3084.5; *Barry v. Ratelle*, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).  This

2   satisfies the exhaustion-of-administrative-remedies requirement under § 1997e(a).  *Id.* at 1237-38.

3   A prisoner need not proceed further and also exhaust state judicial remedies.  *Jenkins v. Morton*,

4   148 F.3d 257, 259-60 (3d Cir. 1998).

5          Plaintiff attempts to argue in his Reply that because he is seeking a stay of his execution, a

6   remedy not available under the administrative appeals process, he is not required to exhaust his

7   administrative remedies.   Plaintiff is wrong.  His Complaint plainly seeks relief from what he

8   alleges is Defendants' inadequate medical care, and such relief is available through the

9   administrative procedure.  Furthermore, as the Supreme Court has stated, the available remedies

10  need not be "plain, speedy and effective" in order for the exhaustion requirement to apply,

11  *Porter*, 534 U.S. at 524, and exhaustion is a prerequisite even when the specific relief sought by a

12  prisoner is not available in administrative proceedings, *Booth*, 532 U.S. at 739; *Brown*, 422 F.3d

13  at 935 (recognizing that so long as "the possibility of some relief for the action complained of" is

14  available through the relevant administrative procedures, the plaintiff is required to exhaust).

15         In addition, Plaintiff's Complaint seeks relief for allegedly inadequate medical care as far

16  back as 1993.  He has had ample time to pursue his administrative remedies for many of the

17  violations alleged in the Complaint, and yet he has, by his own admission, failed to do so.

18  Because he has not exhausted his administrative remedies with regards to the allegedly

19  inadequate medical care he describes in his Complaint, this Court is required to dismiss his

20  Complaint without prejudice.  Notwithstanding this conclusion, the Court now turns to the merits

21  of Plaintiff's Application.

22                          B.  Sixth and Fourteenth Amendments

23         In his second and third causes of action in his Complaint, Plaintiff alleges that

24  Defendants' interference with the preparation of his clemency petition violates the Due Process

25  Clause of the Fourteenth Amendment as well as his right to counsel guaranteed by the Sixth

26  Amendment.  He asserts that Defendants' disregard for his medical needs has hindered his ability

27  to prepare a petition, that his repeated transportation from one facility to another has prevented

28  medical experts from examining him and has interfered with his attorneys' efforts to meet with

7

1   him, and that Defendants' failure to perform laser eye surgery to correct his eyesight has impaired

2   his ability to undergo certain mental examinations.  He alleges that such exams, along with the

3   MRI and SPECT procedures that Defendants have not authorized, would enable a determination

4   of whether he suffers from organic brain damage resulting from a severe beating in 1946 and an

5   episode of pediatric encephalitis that same year.

6         Under *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998), only minimal due-

7   process protections apply to clemency proceedings.  Clemency proceedings satisfy the Due

8   Process Clause as long as the State follows the procedures set out in State law, the State does not

9   arbitrarily deny the prisoner all access to the clemency process, and the clemency decision is not

10  wholly arbitrary or capricious.  *See id.* at 289 (O'Connor, J., concurring) (controlling opinion)

11  ("Judicial intervention might, for example, be warranted in the face of a scheme whereby a state

12  official flipped a coin to determine whether to grant clemency, or in a case where the State

13  arbitrarily denied a prisoner any access to its clemency process.")  Courts have found that even a

14  governor's adoption of a policy uniformly to refuse to grant clemency in all capital cases does not

15  violate the minimal due-process protections applicable to clemency proceedings.  *See Anderson v.*

16  *Davis*, 279 F.3d 674, 676 (9th Cir. 2002).

17        Plaintiff has demonstrated neither a likelihood of success on the merits, nor serious

18  questions going to the merits, of his due-process claim.  Plaintiff cites incidents of alleged

19  disregard for his medical needs, but presents no specific allegations regarding the effect the

20  State's actions have actually had on his ability to prepare a clemency petition.  He states, for

21  example, that on June 15, Defendants arbitrarily cut off vital medications used to treat his heart

22  disease, blood pressure and diabetes.  The medications were not restored until August 4, which

23  apparently was too late to prevent the heart attack he suffered one month later on September 2.

24  He also states that Defendants have failed to provide him with recommended heart surgery.

25  Although these alleged incidents may have led to the deterioration of Plaintiff's health, it is not

26  clear how they actually impaired his ability to prepare a clemency petition.  While Plaintiff

27  alleges that he suffers from exhaustion as a result of Defendants' indifference to his medical

28  needs, he does not allege that he is unable to communicate, comprehend or otherwise assist in the

8

1  preparation of his clemency petition.  Furthermore, Plaintiff cites incidents of alleged medical

2  neglect dating as far back as 1993 and 1997.  These alleged incidents took place too long ago to

3  be relevant to the preparation of his clemency petition, for which the due date was established just

4  this past November 18 when the Glenn County Superior Court set January 17, 2006, as Plaintiff's

5  execution date.

6       Plaintiff's allegation that his repeated movement from one facility to another has

7  prevented him from being examined by retained medical experts as well as meeting with his

8  attorneys, is defeated by the fact that since his return to his cell on October 6, 2005, he has, in

9  fact, been examined eight separate times by four different examiners, and since his heart attack in

10 September 2005, has had at least nine separate visits from his legal team.  He was examined by

11 Pompei on October 17 and was evaluated by Watson on September 21, October 25 and November

12 1.  He was visited by Good on November 30 and December 5.  He was also visited by Stewart on

13 December 2 and December 6.  Satris visited Plaintiff on October 27.  Ferry visited Plaintiff on

14 September 20 and 21, October 6 and 20, and November 8, 16 and 22.  Additionally, Hinckley

15 visited Plaintiff on November 10.  These numerous visits demonstrate that Plaintiff has had

16 significant access to his legal team and medical experts.

17      Plaintiff contends that his legal team and medical experts were nonetheless denied access

18 to him at "critical moments."  He cites no authority requiring attorneys and medical experts to

19 have unfettered access to a prisoner during such times.  Here, the provision of medical care to

20 Plaintiff imposed logistical demands that required his transfer to different facilities with different

21 visitation requirements—for example, at one point Plaintiff was transferred to Corcoran State

22 Prison because, according to his medical records, it was determined that Plaintiff could not be

23 medically managed at San Quentin due to the severity of his medical condition at that time, and

24 Plaintiff's legal team was denied access to Plaintiff following his heart attack on September 2

25 until September 20 because prison policy forbids such access when an inmate is confined in a

26 community hospital.  Plaintiff further contends that Watson's examination of Plaintiff on

27 September 21 was impeded by Plaintiff's exhaustion and shackling, and that a visit planned for

28 the following day was cancelled because Plaintiff was moved to Corcoran.  But by Plaintiff's own

9

1   account, this visit was in fact successfully rescheduled to October 25.  Plaintiff has not

2   demonstrated that the logistical difficulties his legal and medical team may have encountered in

3   visiting him amounted to a violation of the minimal guarantees of due process applicable to

4   clemency proceedings.

5          Finally, Plaintiff contends that Defendants have denied him laser eye surgery which would

6   improve his vision and permit him to participate in tests to determine whether he suffers from

7   organic brain damage.  He asserts that evidence of brain damage would serve as a mitigating

8   factor relevant to his clemency petition.  To investigate the matter further, Plaintiff has requested

9   to undergo MRI and SPECT procedures, which would provide a structural and functional picture

10  of his brain and its activity.  He alleges that Defendants have refused to provide such procedures,

11  even though he maintains they are necessary for the completion of his clemency petition.

12         Defendants' denial of the eye surgery, MRI and SPECT procedures requested by Plaintiff

13  does not violate due process.  There is no case law or statutory authority suggesting that due

14  process requires Defendants to help Plaintiff investigate and develop claims relevant to the

15  preparation of his clemency petition.  Although Defendants may have a duty to provide Plaintiff

16  with medical care such as laser surgery for purposes of preserving his health, they do not have a

17  duty to provide Plaintiff the same services for the purpose of preparing a clemency petition.

18  Defendants' failure to provide Plaintiff with MRI and SPECT procedures likewise does not

19  violate due process.  *Cf. Woodard*, 523 U.S. at 289-90 (prisoner's allegations that three days'

20  notice of interview with parole board members and ten days' notice of clemency hearing before

21  Ohio Adult Parole Authority were inadequate; that he did not have a meaningful opportunity to

22  prepare his clemency application because postconviction proceedings were pending; that his

23  counsel was improperly excluded from the interview; and that he was precluded from testifying or

24  submitting documentary evidence at the hearing did not amount to a due process violation).

25         Furthermore, as Defendants point out, Plaintiff's allegations of organic brain damage must

26  be viewed against the backdrop of almost two decades of collateral litigation challenging his

27  conviction and sentence.  Plaintiff has access to the investigative materials generated by this

28  litigation, including the results of two psychological exams performed at Plaintiff's counsel's

10

1   behest.  In 1991, Morgenthaler prepared a report describing his evaluation of Plaintiff.  He noted

2   that when Plaintiff was ten years old, he suffered head trauma during a fall, and that when he was

3   sixteen, he contracted encephalitis.  The report includes the conclusions that "there were no signs

4   of neurobehavioral impairment and no basis to conclude that Mr. Allen suffers from organic brain

5   dysfunction."  The report prepared in 1996 by White included findings that Plaintiff is dysthymic,

6   anxious and prone to hypochondria.  Furthermore, on collateral review, Magistrate Judge John F.

7   Moulds found that Plaintiff's trial counsel was not obligated to have Plaintiff examined by

8   mental-health experts because there was no indication that he suffered from mental illness.

9   Altogether, Plaintiff has ample psychological evidence, and has long been familiar with the

10  encephalitis and head trauma which he cites as reasons for securing new mental exams.

11      In sum, the Court concludes that Plaintiff has failed to allege State action resulting in a

12  violation of due process or a denial of the right to counsel.  Accordingly, Plaintiff has

13  demonstrated neither a likelihood of success on the merits nor serious questions going to the

14  merits of his second and third causes of action.

15                          C.  Eighth Amendment

16      In Plaintiff's first cause of action, Plaintiff alleges that Defendants' alleged failure to

17  provide adequate medical care has resulted in a violation of his Eighth Amendment protection

18  against cruel and unusual punishment.  Plaintiff argues that a TRO is required because

19  Defendants' failure to provide him with medical care has resulted in his inability to prepare his

20  clemency petition.

21      Plaintiff's request for a TRO based on his first cause of action must be denied.  Plaintiff

22  has demonstrated neither a likelihood of success on the merits, nor serious questions going to the

23  merits, of his first cause of action.  Plaintiff argues in his reply brief that, even though much of the

24  harm alleged in the first cause of action has already occurred, some of it more than a decade ago,

25  the extraordinary remedy of a TRO to stop the execution and clemency process is required

26  because "Defendants' failure to provide adequate medical care cannot be separated from

27  Defendants' interference with Mr. Allen's clemency petition."

28      Plaintiff's argument is without merit.  Plaintiff presents no specific allegations regarding

                                            11

Case No. C 05 5051 JSW
ORDER DENYING PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO
SHOW CAUSE AND DISMISSING PLAINTIFF'S FIRST AMENDED COMPLAINT WITHOUT PREJUDICE
(DPSAJBDVGGOK)

1    the effect the state's actions have actually had on his ability to prepare a clemency petition.   As

2    already discussed, while Plaintiff has alleged that Defendants' actions have contributed to his ill

3    health,[3] he has not shown that Defendants' alleged indifference to his health needs have

4    negatively impacted his due-process rights to prepare a clemency petition such that an order

5    staying the scheduled execution is required.  The record demonstrates that, since September 2005,

6    Plaintiff has met with retained medical experts at least four times and with his legal team at least

7    nine times.   Furthermore, on December 13, Plaintiff filed a lengthy and thorough clemency

8    petition, a fact which tends to belie his assertion that Defendants' behavior has interfered with his

9    clemency rights.  In sum, Plaintiff's allegations of inadequate medical care do not support his

10    request for a stay of execution.

11                              D.  Possibility of Injury and Balance of Hardships

12           Plaintiff alleges that, absent a TRO, he is likely to face the irreparable injury of execution,

13    and thus that the balance of hardships tips strongly in his favor.  Defendants counter that it is not

14    enough for Plaintiff to assert that he will be executed, as there is no authority for the proposition

15    that irreparable injury warranting a stay of execution is present in every case brought by a person

16    on death row.

17           Defendants are correct.  While this Court is mindful of the fact that Plaintiff is facing the

18    ultimate punishment, that alone does not entitle to him to a stay.  As detailed above, Plaintiff has

19    not demonstrated that he is likely to succeed on the merits nor has he demonstrated serious

20    questions going to the merits of his claims that Defendants have violated his rights regarding the

21    filing of his clemency petition.  Given this, even the fact that Plaintiff is facing execution cannot

22    entitle him to the injunctive relief of a stay.

23           In his clemency petition (as well as with the present litigation), Plaintiff has made

24    Defendant Schwarzenegger aware of his allegations of his need for medical treatment as well as

25

26           [3]While Plaintiff must be mentally competent for the state to execute him, *Ford v. Wainwright*,
27    477 U.S. 399 (1986), there is no requirement that he be in a particular state of physical health in order for
      the execution and clemency proceedings to move forward.  Plaintiff does not allege that he is
28    incompetent.

                                                          12

1  further testing to explore the possibility that Plaintiff may suffer from organic brain damage.  As a

2  result, Defendant Schwarzenegger may do one of three things.  First, he may commute Plaintiff's

3  sentence based on the information already before him, in which case a stay from this Court would

4  serve no legitimate purpose.  Second, Defendant Schwarzenegger may conclude that he is not

5  moved to grant clemency even if Plaintiff's allegations of organic brain damage were to be

6  demonstrated, also in which case a stay from this Court would serve no legitimate purpose.

7  Finally, Defendant Schwarzenegger may decide that he requires the evidence proffered by

8  Plaintiff before making a determination about commutation, in which case he will grant Plaintiff a

9  reprieve that would make a stay issued by this Court duplicative.  Accordingly, and in light of

10  "the State's strong interest in proceeding with its judgment," *Gomez v. United States Dist. Ct. for*

11  *N.D. Cal.*, 503 U.S. 653, 654 (1992), the balance of hardships tips sharply against granting

12  Plaintiff's Application for a stay of execution.

13  IV.  DISPOSITION

14  There is no question that Plaintiff is old and infirm.  These may be factors to be

15  considered in a bid for clemency.  But it is not for this Federal Court to intrude on the

16  prerogatives of the State Executive to determine what information he requires in deciding whether

17  to have mercy on a condemned prisoner.

18  Accordingly, and for the foregoing reasons, Plaintiff's Application for a Temporary

19  Restraining Order and Order to Show Cause is denied and Plaintiff's First Amended Complaint is

20  dismissed without prejudice.

21  *It is so ordered.*

22

23  DATED:  December 15, 2005

24  JEFFREY S. WHITE
   United States District Judge

25

26

27

28

13